UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
|    TAI T. VUONG | ) | Case No. 05-15267-SSM |
| | ) | Chapter 7 |
|                 Debtor | ) | |
| | ) | |
| MANOUCHEHR SOHEILY | ) | |
| | ) | |
|                 Plaintiff | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 06-1032 |
| | ) | |
| TAI T. VUONG | ) | |
| | ) | |
|                 Defendant | ) | |

**MEMORANDUM OPINION**

This is an action to determine the dischargeability of a $71,789.78 loan made by the plaintiff, Manouchehr Soheily, to the debtor, Tai T. Vuong, that Mr. Soheily asserts was procured by false pretenses, false representations, or actual fraud. A trial, at which each of the parties represented himself *pro se*, was held on September 29, 2006. Based on the evidence and the applicable law, the court determines that the debt is not excluded from discharge. This opinion constitutes the court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52(a).

Background and Findings of Fact

1

Tai T. Vuong ("the debtor") filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in this court on October 14, 2005, and received a discharge of his dischargeable debts on February 6, 2006. Among the creditors listed on his schedules was Manouchehr Soheily, who held a claim secured by a third deed of trust against real estate located at 402 Hummer Court, Sterling, Virginia. During the case, the first deed of trust holder was granted relief from the automatic stay in order to foreclose, and none of the subordinate deeds of trust received anything from the foreclosure sale.

The loan in question was made in connection with the debtor's purchase of Mr. Soheily's house located at 12642 Builders Road, Herndon, Virginia. The debtor, after visiting the property with his wife and children, signed a contract to purchase the property for $690,000.00.[1] Of this amount, $683,000.00 was to be financed. With the contract, the debtor submitted a written loan commitment from an entity called Sunny View Mortgage Company. Settlement was set for June 17, 2005, but only hours before the settlement the real estate agent was advised that the loan had been denied. There is some dispute in the testimony as to the reason for the denial: the debtor says he was told it was because the property did not appraise for a sufficient amount, while Mr. Soheily's real estate agent, Vida Petrus, testified it was because the debtor was not financially qualified for the loan. In any event, Ms. Petrus then introduced the debtor to another lender, First International Mortgage Company, but told him that he needed a qualified co-borrower. There is a dispute was to whether Ms. Petrus told him the co-borrower needed to be a family member. She says that

---

[1] This is the amount stated in the testimony. However, the settlement statement (HUD-1 form) introduced as one of the plaintiff's exhibits shows a purchase price of $695,000.

2

she did, and that he represented the co-borrower he produced, Phung Kieu, to be his sister. The debtor says that Ms. Petrus did not tell him that Ms. Kieu—who he admits was not his sister—had to be an actual relative, and he said that when he referred to her as his "sister," the term was simply a way in his culture of showing respect to an older woman.

In any event, a loan was approved, apparently in the form of a $550,000 first trust and a $100,000 second trust. Ms. Petrus did not learn until after the loan was approved that Ms. Kieu was not a blood relation, although it appears that she was aware of that fact by the time the rescheduled closing took place on July 15, 2005, at the offices of RGS Title. Prior to the settlement, the debtor called Mr. Soheily and told him he was still approximately $60,000 short of the amount needed to settle. Mr. Soheily agreed to lend him the amount needed, and the debtor agreed to sign a note for the amount loaned plus $7,000.00 for "expenses." A document dated July 18, 2005, was signed, stating that Mr. Soheily would provide $71,789.78, repayable within 3 months,[2] on the condition that the debtor provide a lien on two other pieces of property, 402 Hummer Court and 106 Cypress Road, Sterling, Virginia. Mr. Soheily did not have the money himself, but was able to borrow it from other sources, and delivered a check—apparently for $64,789.78—to RGS Title to enable the settlement to close.[3]

---

[2] There is an internal inconsistency in the agreement, since the phrase "3 months time" is followed by a parenthetical "180 day" [*sic*], which of course is six months, not three. There seems to be no dispute, however, that three months was the intent.

[3] This amount is shown on the settlement statement (HUD-1 form) as cash due from borrower. The cash proceeds to Mr. Soheily and his wife are shown as $325,139.03.

Under the agreement, the key to the Builders Road property would not be delivered to the debtor until the liens securing Mr. Soheily's loan were recorded. According to Ms. Petrus's testimony, a different title company, Alliance Settlement, was asked to record the liens.[4] Although Ms. Petrus's testimony was not entirely clear, Alliance evidently did a title search on both properties. Based on that search, Ms. Petrus decided there was no equity in the Cypress Road property (which was actually owned by the debtor's father) and that the lien would solely be against the Hummer Court property. The title report, which is included among the plaintiff's exhibits, reflects a $362,700 first deed of trust against the Hummer Court property in favor of New Century Mortgage Corporation and a $120,000 second deed of trust (which was also a lien against two other parcels) in favor of Young B. Kim.

In any event, the debtor appeared at Alliance and signed a note dated July 22, 2005, promising to pay Mr. Soheily $71,789.78, with interest at 10% per annum, on October 22, 2005. The note was secured by a deed of trust against the Hummer Court property. Upon being informed by Alliance that the deed of trust had been recorded, Mr. Soheily told the debtor where the key to the property was located, and the debtor and his family moved in.

At or about that time, the debtor had obtained a written appraisal of the Hummer Court property reflecting a fair market value of $656,000.00. He testified that he had been told by a real estate agent that, even though the market was softening, he could easily get $599,000.00 for the property. The debtor's bankruptcy schedules, filed three months later, reflect that $362,700 was owed on the first deed of trust, and that Mr. Kim was owed

---

[4] From the exhibits, it appears that the actual name of the company was Great Alliance Title and Escrow.

$90,000 on the second deed of trust.  The debtor testified that at the time the loan was made, he believed he could sell the Hummer Court property within three months, but that despite his best efforts, he was unable to sell the property for an amount sufficient to clear the encumbrances,[5] which left him with no choice but to file bankruptcy.  On his bankruptcy schedules, he listed the value of the Hummer Court property at $485,000, subject to encumbrances of $524,489, leaving the property substantially under water.

Conclusions of Law and Discussion

I.

This court has subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  An action to determine the dischargeability of a debt is a core proceeding in which a final judgment or order may be entered by a bankruptcy judge.  28 U.S.C. § 157(b)(2)(I).  Venue is proper in this district under 28 U.S.C. § 1409(a).  The defendant has been properly served and has appeared generally.

II.

A chapter 7 discharge discharges an individual debtor from all debts that arose prior to the filing of the bankruptcy petition except for certain specified categories of debts.  §§ 727(b) and 523(a), Bankruptcy Code.  Among the debts excluded from discharge are debts:

---

[5] While the debtor's testimony on the point was somewhat confusing, it appears that the second deed of trust holder, Mr. Kim, had a lien against three properties; that there was some agreement allocating the indebtedness among them; but that Mr. Kim insisted on payment of the full indebtedness from the sale of the Hummer Road property, which effectively prevented the debtor from selling the property for an amount sufficient to clear the liens.

>    for money, property, services, or an extension, renewal, or refinancing of
>    credit, to the extent obtained by—
>       (A) false pretenses, a false representation, or actual fraud, other than a
>       statement respecting the debtor's or an insider's financial condition;
>       [or]
>       (B) use of a statement in writing—
>           (I) that is materially false;
>           (ii) respecting the debtor's or an insider's financial condition;
>           (iii) on which the creditor to whom the debtor is liable for such
>           money, property, services, or credit reasonably relied; and
>           (iv) that the debtor caused to be made or published with intent
>           to deceive.

§ 523(a)(2), Bankruptcy Code. It is important to note that different standards apply depending on whether the false statement is one "respecting the debtor's ... financial condition." If it is, the statement must be in writing and the creditor must have "reasonably" relied on it. § 523(a)(2)(B), Bankruptcy Code. Other types of misrepresentations need not be in writing and the creditor's reliance need only be "justifiable," which is a lesser standard than "reasonable." § 523(a)(2)(A), Bankruptcy Code; *Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995). To show actual fraud under § 523(a)(2)(A), the creditor must prove the following elements: "(1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation." *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 134 (4th Cir. 1999). The burden of proof is on the plaintiff, and the standard of proof is preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).

III.

In closing argument, Mr. Soheily identified three false representations upon which he relied. The first was that the debtor falsely represented that he was financially qualified to

purchase the property.  The second was that he misrepresented Ms. Kieu to be his sister. The third was that he falsely represented that he would repay the loan within three months.

A.

With respect to the first alleged representation—that the debtor was financially qualified to purchase the property—the statute clearly requires that any misrepresentation as to the financial condition of the debtor must be in writing in order for a loan made in reliance upon it to be nondischargeable.  § 523(a)(2)(B), Bankruptcy Code.  The only writing that Mr. Soheily has identified is the agreement dated July 18, 2005.  Pl. Exh. 3. That agreement states, "The total of $71,789.78 is promised to Mr. Vuong." *Id.* It further states, "The lien is to be placed on below properties as security and collateral" and lists both the 402 Hummer Court and 106 Cypress Road properties.  *Id.*  Significantly, the agreement makes no representation as to Mr. Vuong's income, expenses, or debts.  Nor does it make any representation as to the value of the two listed properties or the existence or absence of other liens against them.  Put simply, the agreement is completely devoid of any express representation as to the debtor's financial condition or his ability to repay the loan.  To be sure, any promise—whether oral or written—to repay a loan may carry with it an implied representation that the borrower has the financial ability to do so; however, an implied representation is not sufficient to satisfy the requirement of § 523(b)(2)(B).  In the absence, therefore, of any written representations as to the debtor's income, expenses, debts, or assets, the court cannot find that Mr. Soheily has carried his burden of proof that the debt is nondischargeable based on a false representation of ability to pay.

7

B.

The second alleged misrepresentation upon which Mr. Soheily relies is that Ms. Kieu, the borrower of record, was his biological sister.  There is no question that the debtor identified her to the loan broker as his sister and that she was not in fact his sister.  Although Mr. Vuong attempts to explain away the characterization as simply a title of respect, the court finds that in the specific context in which the statement was made, he knew the characterization would be taken literally.  Exactly why Ms. Kieu's relationship to Mr. Vuong would have been important to the mortgage company in making the loan is not entirely clear, but for the purpose of the present ruling, the court accepts Ms. Petrus's testimony that the mortgage company would not have made the loan had it known Mr. Vuong and Ms. Kieu were not related.   The problem, however, is there is no evidence that the misrepresentation was relied upon by Mr. Soheily.  Indeed, while Ms. Petrus's testimony is not entirely clear, it appears that she was fully aware, by the time the settlement actually took place, that Ms. Kieu was not the debtor's sister.  While Ms. Petrus was upset at this discovery— which she presumably communicated to her client, Mr. Soheily— Mr. Soheily nevertheless (perhaps feeling he had no real alternative) closed on the transaction.  Thus, there simply is no proof that he actually relied (justifiably or otherwise) on the representation that Ms. Kieu was the debtor's sister.  Whether or not the mortgage company relied on the representation is not the issue; the question is whether Mr. Soheily did.  Since there is no showing that he did, the misrepresentation provides no basis for excluding the debt from discharge.

C.

The final alleged misrepresentation upon which Mr. Soheily relies is the debtor's unfulfilled promise to repay the loan in three months. A mere failure to keep a promise of future performance, however, does not constitute fraud unless at the time the promise was made the debtor had no intention of carrying through. Although the loan was not repaid, there is no evidence in the record to show that the debtor did not intend to repay it at the time he entered into the transaction. The debtor testified that at the time he borrowed the money, he believed the Hummer Court property had sufficient value to pay all the liens against it, and that it was only after efforts to sell the property failed that he filed for bankruptcy. Specifically, he testified that he had a written appraisal showing a value of $656,000, and that a realtor had told him that even in the softening real estate market, he could sell the property for $599,000. The liens against the property, including Mr. Soheily's, totaled approximately $525,000. Mr. Vuong's testimony that he intended to repay the loan and was only prevented from doing so by the falling real estate market is credible. Accordingly, the court cannot find that Mr. Soheily has carried his burden of showing that the debtor did not intend to repay the loan at the time it was made.

D.

Although Mr. Soheily did not raise the issue in closing argument, his pleadings also assert that the debtor fraudulently failed to provide him with a deed of trust against the Cypress Road property. Ms. Petrus's testimony is clear, however, that based on a title search conducted prior to the loan closing, she determined that there was no equity in the Cypress Road property, and a decision was made to go solely with the Hummer Court

9

property. Mr. Soheily also asserted in his pleadings that the debtor represented that the loan would be secured by a second deed of trust. Since a title search of the property was done prior to the loan closing, Mr. Soheily was charged with notice of the existing second deed of trust in favor of Mr. Kim. In any event, a representation as to whether property being offered as security is already encumbered is a statement respecting financial condition and must be in writing in order to serve as a basis for dischargeability. *Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060 (4th Cir. 1984). The July 18, 2005, loan agreement makes no express representation that Mr. Soheily would be in a second lien position. It simply states that he would receive a lien. But even if the debtor had orally assured him the lien would be in second position, an oral misrepresentation that the property was not already encumbered provides no basis for excluding the debt from discharge. *Id.* at 1061.

## IV.

That Mr. Soheily has experienced an unfortunate financial loss is unquestionable. However, it is not the magnitude of the loss nor the creditor's good faith in accommodating the debtor that determines whether a debt is excluded from discharge. The question, rather, is whether the debt falls within one of the narrow categories of debts statutorily excluded from discharge. Debts arising from false statements, false representations, or actual fraud are among those so excluded. The evidence before the court, however, fails to establish fraud. The evidence, rather, reflects a debtor who fully intended to repay Mr. Soheily but was caught by a falling real estate market. For that reason, a separate judgment will be entered determining that the debt is not excluded from discharge.

Date: _____          _____

Case 06-01032-SSM    Doc 22    Filed 11/01/06    Entered 11/02/06 14:13:15    Desc Main
                          Document      Page 11 of 11

                                  Stephen S. Mitchell
Alexandria, Virginia                        United States Bankruptcy Judge

Copies to:

Manouchehr Soheily
22726 Airmont Hunt Drive
Ashburn, VA 20148
Plaintiff *pro se*

Tai T. Vuong
825 T. Ave, #33
Nevada, IA 50201
Defendant *pro se*